UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEPHEN RUFF,

        Plaintiff,

v.

        Case No. 11-CV-11110

        HON. GEORGE CARAM STEEH

REISING, ETHINGTON,
BARNES, KISSELLE, P.C..,

        Defendant.
_____/

OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (DOC. 34) AND
DENYING DEFENDANT'S MOTION FOR SANCTIONS (DOC. 44)

        Plaintiffs Stephen Ruff and Ruffactory, Inc. filed this suit asserting legal malpractice, negligence, and fraud.  On June 21, 2011, upon stipulation of the parties, the claims of Ruffactory, Inc. were dismissed without prejudice.  Before the court are defendant's motions for summary judgment and for sanctions.  The motions are fully briefed and the court finds that oral argument is not necessary.  See Local Rule 7.1(f).  For the reasons that follow, the court GRANTS defendant's motion for summary judgment and DENIES defendant's motion for sanctions.

BACKGROUND

        Since 1984, plaintiff's main occupation has been the sale of life and disability insurance as an independent agent.  In about 1995, plaintiff developed a board game called "The Guardians," which he says was intended to teach child safety.  In the same time frame, plaintiff formed Ruffactory to sell the board game.  Initially, Ruffactory was a sole proprietorship.  The company was incorporated in Florida in 1997.  In April 2001, plaintiff

incorporated Kidsational, Inc. in Florida. Kidsational was formed to engage in the same business as Ruffactory, Inc.

In December 2002, Kidsational, Inc. and Ruffactory, Inc. were merged into a Nevada corporation called Square Moon, Inc. Square Moon was a "penny stock" corporation, and as part of the merger transaction, Square Moon's name was changed to Kidsational, Inc. Pursuant to the merger agreement, as of the effective date, all of the assets of the merged entities were transferred to Kidsational, Inc. of Nevada, and the two Florida corporations ceased to exist. In addition to plaintiff, Edward Howie was an executive and owner of Kidsational, Inc.

In 2006 through 2008, Kidsational's products included The Guardians game, t-shirts, hats, flashlights, whistles, and stickers. Kidsational held music tours for a group called "TGK" and had rights to a film called "The Guardians" that plaintiff was involved in producing.

Plaintiff testified that in December 2008, he and Howie sold all of their shares in Kidsational to Stratton Holdings, who wanted a "pink sheet shell," and Kidsational ceased to exist. Plaintiff testified that at the time of the sale, all of Kidsational's intellectual property rights were conveyed to him.

Beginning in late 1995, and over the next several years, Reising attorney Paul Ethington (who has been deceased since 2003) filed numerous applications on behalf of Ruffactory to federally register trademarks. Ethington also filed patent applications for a shoe with a storage compartment in the heel and for The Guardians board game.

On February 26, 1998, Ethington filed the application for the shoe patent that is in part the subject of this lawsuit. On July 13, 1999, the United States Patent & Trademark

Office granted the shoe application and issued Patent Number 5,921,008 ("008 Patent"). The patent claimed a shoe having a drawer that pulled out of the heel. In March 2003, the 008 Patent was assigned to Kidsational, Inc.

On August 27, 1998, Ethington filed the application for "The Guardians" trademark, which is also the subject of plaintiff's complaint. The registration for The Guardians mark issued on October 30, 2001.

On January 17, 2002, Ethington wrote plaintiff and sent him the original registration for The Guardians mark. The registration was for "hats, pajamas, t-shirts and socks, in Class 25" and for "board games, and toy wristband, toy flashlight, toy whistle and puppets in Class 28." The registration identified the registrant as Ruffactory, Inc.

In his January 17, 2002 letter, Ethington advised plaintiff that the registration would be cancelled after six years unless an affidavit was filed showing that the mark was still in use. Ethington advised plaintiff that the due date for the affidavit was October 30, 2007, and further advised plaintiff that he would "be responsible for any further work on the file." Specifically, Ethington stated:

> Enclosed herewith is the original trademark registration document which is being forwarded to you for safekeeping.
>
> Under the trademark law, this registration will be cancelled at the end of six years following the date of registration, unless within the preceding year, the registrant files in the U.S. Patent and Trademark Office an affidavit showing that the mark is still in use.
>
> ***
>
> I have enclosed a copy of our status sheet for this trademark. Please note the due dates as you will be responsible for any further work on this file.

The attached "status sheet" identified the "client" as Ruffactory, Inc., and indicated

-3-

that the affidavit was due on October 30, 2007. Plaintiff testified that Ethington's letter went to the correct address.

In 2003, Kidsational began to use other intellectual property counsel. Plaintiff had no further contact with the Reising firm until March 2006, when he requested that Reising secretary Theresia Blasciuc *nee* Kayl send him the registration number and issuance date for The Guardians mark. She forwarded the requested information to him on March 23, 2006 in a fax.

In December 2006, plaintiff called the Reising firm to speak with Ethington about registering the name of The Guardians film. He was advised that Ethington had passed away, and was referred to other attorneys at the firm, who advised him that the film title could not be registered as a trademark.

In 2007, plaintiff contacted the firm to inquire about the possible infringement of patents assigned to Kidsational.

In a June 27, 2007 letter, addressed to Mr. Ruff, Ruffactory, Inc., 14890 Faversham Circle, Orlando, Florida, Theresia Blasciuc, secretary to attorney James Stevens, advised plaintiff that an "affidavit must be filed to maintain the registration [for The Guardians trademark] in force." Blasciuc stated:

> More specifically, if the mark is presently being used in connection with hats, pajamas, t-shirts and socks; board games, and toy wristband, toy flashlight, toy whistle and puppets as recited in the registration, then we must now file a Section 8 Affidavit to maintain the registration in force. To file the Section 8 Affidavit, we will need digital photographs clearly showing the mark on the various products recited in the registration. Also, if the mark has been in continuous use in connection with the services since the October 30, 2001 date of registration, we are entitled to file the Section 15 Affidavit, which renders the registration incontestable, thereby making it more difficult for a third party to challenge your use and ownership of the mark.

> Accordingly, if your company's use of the mark has been continuous and ongoing, then please let me know and we will have the affidavit completed and filed. The cost for preparing and filing these affidavits is $1400 including both the government fees and our service fees which we will need in advance before filing the affidavits.

Blasciuc requested that plaintiff provide his "instructions on or before August 30, 2007," along with a check for $1400 if he wished to proceed.

Within weeks, Blasciuc realized she might have sent the June 27, 2007 letter to an outdated address. On July 18, 2007, she emailed plaintiff under the subject "address update," asking "[c]ould you please provide me with your current mailing address? I recently sent you a letter regarding THE GUARDIANS trademark and I just want to make sure I sent it to the correct address." Plaintiff replied with his current address, "874 Mills Estate Place, Chuluota, FL 32766." The next morning, Blasciuc responded by attaching the letter to her reply and stating "[o]kay, I sent it to another address. Here's the letter though as it was sent and I'll send all future correspondence to the address you just gave me. Please confirm receipt." Plaintiff responded within a half hour, stating "I got it[.] Thanks[.]" At his deposition, plaintiff admitted that these emails were sent to the correct email address and did not dispute that the email exchange occurred.

> Q. And you responded, or at least according to this document, July 19th, 2007, "I got it. Thanks." Do you see that?
>
> A. Yeah.
>
> Q. And do you recall you told me that your computer crashed in 2008 and you were unable to retrieve E-mails that predate mid-2008?
>
> A. Yeah.
>
> Q. And I think you can be forgiven for not recalling an exchange like this, you know, years later, but do you, seeing this now, agree that you probably were sent this E-mail from Theresia and replied, "I got it"?

-5-

> A. These here, this one here when I had, I imagine that one, this one I never seen.
>
> Q. Let's talk about this. So the E-mails, the July 18th E-mail, the July 19th response from Theresia and the July 19th reply from you, "I got it, thanks," you don't – you're not questioning that, that E-mail exchange occurred?
>
> A. No.
>
> Q. And then when Theresia says here's the letter though as it was sent, you understand her to be saying that the letter's attached to the E-mail that she's got?
>
> A. Yes.
>
> Q. And so you don't question that you probably received that, just don't recall it currently?
>
> A. What, the letter that was sent here?
>
> Q. Yeah.
>
> A. You know, again, what I could have done is I could have passed right by it or –
>
> Q. That's possible certainly.
>
> A. Yeah.

On October 30, 2007, Blasciuc emailed plaintiff again and sent him another copy of her June 27, 2007 letter, stating:

> We never did hear back from you concerning the letter we discussed below (copy attached). Therefore, the deadline to file an affidavit under Section 8 & 25 for "THE GUARDIANS" U.S. trademark has entered into the grace period which will now expire on April 30, 2008 and will require payment of additional government fees.
>
> If an affidavit is not filed by the new deadline of April 30, 2008, you will lose all rights to the trademark.
>
> Please review the letter for specific requirements concerning specimens and if you wish to file an affidavit under Section 8 & 15 by the final deadline, we

>will provide you with an estimate of total cost that will be required in advance. We will need your instructions and payment by March 30, 2008.

Plaintiff did not dispute that Blasciuc sent the October 30, 2007 email when he testified as follows:

>Q. And you're saying that you don't recall the October 30, 2007, E-mail that's on Exhibit 36.
>
>A. Yeah, I don't recall anything for entering a grace period.
>
>Q. But you're not saying that Jim Stevens fabricated this document, are you? That's marked Exhibit 36.
>
>A. Oh absolutely not.
>
>Q. And you're not saying that this October 30, 2007, E-mail wasn't sent to you, what you're saying is you don't recall receiving it?
>
>A. I don't recall receiving it. As far as this particular document? No. As far as that E-mail.
>
>Q. But you're not in a position to say it wasn't sent to you.
>
>A. No.
>
>Q. The October 30, 2007, E-mail, correct?
>
>A. No.
>
>                                 ***
>
>Q. And let me go back to Exhibit 36. Can you look at that again?
>
>A. Yeah.
>
>Q. And just with respect to the October 30, 2007, E-mail that's on the top of it.
>
>A. Yeah.
>
>Q. You do not dispute that Teresa sent that document, that E-mail to you, you just don't recall receiving it, correct?

> A. I don't recall receiving that, no.
>
> Q. So my statement's correct?
>
> A. That I don't recall receiving it?
>
> Q. No, that you're not in a position to dispute that Teresa sent this E-mail to you on October 30, 2007, correct?
>
> A. No, I'm not disputing that she sent that on there.

In fact, the following week, plaintiff called and referenced that he had received something regarding The Guardian trademark. On November 6, 2007, Reising attorney Theresa Chrisholm (who was then working with plaintiff on the Kidsational patent infringement suit) emailed Stevens, stating that she had received a voicemail from plaintiff and that he "said he received something for the trademark on guardians (?)." Stevens replied that he would call plaintiff the next day.

On November 7, 2007, Stevens, after obtaining a copy of Blasciuc's June 27, 2007 letter regarding the affidavit, called plaintiff. Stevens specifically recalls speaking to plaintiff about needing to file an affidavit in order to keep the registration for The Guardians trademark in force. Plaintiff did not indicate that he wished to file an affidavit and incur the expense of doing so. Plaintiff testified that he assumes he spoke with Stevens on November 7, 2007, based on the email correspondence. Plaintiff does not recall anything said in the conversation and acknowledges that Stevens could have mentioned something about The Guardian mark.

On April 25, 2008, Blasciuc emailed plaintiff one more time and again sent him a copy of the June 27, 2007 letter. No response was received.

In June 2007, plaintiff contacted the Reising firm about asserting Kidsational's patent

rights. Plaintiff believed that "Reef," a company manufacturing and selling a sandal with a storage compartment in the heel, was infringing the patents. In a July 2, 2007 email to Stevens, plaintiff argued that the Reef sandal contained a drawer that duplicated the drawer claimed in the 008 patent. In the email, plaintiff refers to a letter in which, according to plaintiff's complaint, Ethington "explained that the 'Shoe' Patent gave Plaintiffs protection against infringement of any shoe that had a compartment in the 'region of the heel.'" Plaintiff, who apparently had previously mentioned the letter to Stevens, stated that Howie was looking for the letter and asked Stevens to look as well. The letter, dated December 7, 2000, was a response to a request from plaintiff to compare a "shoe pocket" patent that had been recently granted and the 008 patent. Ethington advised plaintiff that he believed the shoe pocket disclosed in the patent (the "Potts patent") infringed the 008 patent. The letter does not state that the 008 patent covers any shoe compartment in the heel.

On July 10, 2007, Stevens advised plaintiff that "I think we have a basis for going forward [with litigation] if that is what you want..." On July 16, 2007, plaintiff emailed Kidsational's settlement position, which sought $100,000 for past sales and exclusive licensing rights at a five percent royalty rate. On or about August 7, 2007, Reising filed a lawsuit on behalf of Kidsational, Inc. against VF Outdoor, Inc., d/b/a Reef, and South Cone, Inc. d/b/a Reef, alleging infringement of the 008 patent. On the same date, Reising attorney Andrew Grove sent a copy of the complaint to Reef's counsel and demanded a $100,000 payment and a five percent royalty going forward.

The parties then engaged in discovery. On January 10, 2008, Stevens emailed plaintiff and advised him that Reising had not received payment for over three months and $10,000 was owed and that Reising needed a retainer agreement, as they had previously

discussed. The following month, plaintiff executed an engagement letter on behalf of Kidsational, Inc.

Also on January 10, 2008, Grove emailed plaintiff advising him that Reef had indicated that it did not want a license and had offered to buy the patent for $20,000. On January 22, 2008, Grove emailed plaintiff and advised that he recommended the retention of an expert, that the cost of litigation would be increasing, that Stevens wanted payment on past bills, and that they were recommending a California trip in late February or early March for depositions.

On February 13, 2008, Reef's counsel wrote Grove and advised him that Reef had decided to no longer produce any of the accused sandals and offered to enter into a licensing agreement. As plaintiff has acknowledged, the letter was a dramatic development for the litigation because it meant Kidsational's royalty would be limited to the sandals already sold and the remaining inventory "which wasn't much money at all." Reef also sent Grove two new sandals and asked for confirmation that the new sandals did not infringe the patent. Grove advised plaintiff that the new sandals did not infringe either of Kidsational's shoe patents.

On February 15, 2008, Grove wrote Reef and offered to settle the case based on a five percent royalty rate on a non-exclusive license if the parties could come to an agreement on the royalty base. On February 20, 2008 and again on February 25, 2008, Grove emailed plaintiff and advised him that they had not heard back from Reef and reminded him of the need for payment. On March 20, 2008, Reef's general counsel, Rafferty Jackson, emailed Grove and offered to settle the case for a one time payment of $108,500 and a representation that Reef would sell no more than 245,400 sandals. The

next day, Grove forwarded the email to plaintiff and Howie and stated "let me know what you think. It looks like a satisfactory way to resolve this." Howie responded negatively and advised Grove that he wanted to contact Jackson directly, stating:

> Its been 2 weeks of going back and forth. Not any fault of yours but they are offering less and you are costing us more.
>
> With your consent, I would like to speak directly with Rafferty Jackson and tell her that we are no longer going to play this game. She can agree to pay $120,000 or we can continue the lawsuit.

Grove responded that he could not stop Howie from contacting Jackson, but he thought the settlement offer was reasonable. Plaintiff does not remember whether Howie contacted Jackson. However, effective April 2, 2008, plaintiff executed a settlement agreement on behalf of Kidsational agreeing to a lump sum payment of $108,500 and a 5% royalty on any of the infringing sandals if Reef sold more than 245,500 of them. Plaintiff read and understood the agreement.

Shortly thereafter, defendant sent Kidsational a check for $80,091 and credited the balance of the $108,500 settlement payment to Kidsational's outstanding balance. The total bill for the Kidsational litigation was $44,367. On April 17, 2008, the court entered an order dismissing the Kidsational lawsuit. As plaintiff admitted, defendant's services with respect to the Kidsational patent lawsuit were complete at that time.

After April 2008, defendant had no further contact with plaintiff or anyone else from Kidsational. On November 10, 2008, Stevens sent plaintiff a closure letter. In the letter, addressed to plaintiff at Ruffactory Co., Stevens stated:

> I am writing this letter to thank you for your business over the years and to wrap up our representation of your companies now that there is no longer any pending intellectual property work that we are handling on your behalf.

> As you know, we concluded your company's lawsuit against VF Outdoor, Inc. several months ago. Also, I note that you did not seek to continue your company's registration of THE GUARDIANS mark by the required due date earlier this year and that the registration has now been cancelled...

Stevens also advised plaintiff of the maintenance fee dates for his outstanding patents. Plaintiff acknowledged that the closure letter was sent to the correct business address.

ANALYSIS

Defendant's Motion for Summary Judgment

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment forthwith if the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson, 477 U.S. at 247-48 (emphasis in original).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968); see also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. Id.

In response to defendant's motion for summary judgment, plaintiff agreed to the dismissal of counts II, IV, and V of the complaint. Counts I and III, the legal malpractice claims, remain. Count I is a claim for legal malpractice based on "The Guardians" trademark. Plaintiff alleges defendant breached its duty to properly advise plaintiff of any action necessary to ensure protection of the mark. Specifically, plaintiff claims defendant breached the duty by failing to sufficiently notify plaintiff of the necessary continued use filing and thus plaintiff's mark was cancelled. Count III is also a claim for legal malpractice. In count III, plaintiff claims defendant pushed plaintiff into settling the Kidsational patent litigation. As a result, plaintiff claims he settled the case for less than it was worth. He claims there is a letter from Ethington, which would have been in defendant's files, describing the shoe patent. He claims this letter would have indicated that the Reef shoes clearly infringed on the shoe patent. He alleges he found the letter on or about March 3, 2010. In its motion for summary judgment, defendant argues, among other things, that

counts I and III are barred by the statute of limitations.

Under Michigan law, a legal malpractice claim must be brought within two years of the date the attorney ceases to serve the client or within six months of when the client discovered or should have discovered the claim, whichever is later. MCL 600.5805(6); MCL 600.5838. A claim for professional malpractice accrues "at the time [the professional] discontinues serving the plaintiff in a professional or pseudoprofessional capacity as to the matters out of which the claim for malpractice arose..." MCL 600.5838(1). If the facts are undisputed, the issue of when a defendant attorney discontinued representing his or her former client is a question of law for the court to decide. Tonegatto v. Budak, 112 Mich. App. 575, 581 (1982).

The Michigan Supreme Court has ruled that the statute means what it says and that a legal malpractice claim accrues on the attorney's "last day of professional service" as to the matter out of which the claim for malpractice arose. Gebhardt v. O'Rourke, 444 Mich. 535, 543 (1994). An attorney discontinues service to a client "when relieved of the obligation by the client or the court...or upon completion of a specific legal service that the lawyer was retained to perform." Maddox v. Bulingame, 205 Mich. App. 446, 451 (1994) (citations omitted). "[N]o formal discharge by the client is required, and the termination of an attorney-client relationship can be implied by the actions or inactions of the client." Estate of Mitchell v. Dougherty, 249 Mich. App. 668, 683-84 (2002).

Plaintiff filed his complaint asserting malpractice claims on November 10, 2010. As to count I, even if we assume defendant was retained to advise as to the affidavit of use, such services were complete in April 2008. The services were finished either by April 25, 2008, when Blasciuc again advised plaintiff of the deadline for filing an affidavit of use, or

by April 30, 2008, the deadline for filing the affidavit. The fact that Stevens wrote a letter on November 10, 2008 stating "there is no longer any pending intellectual property work that we are handling on your behalf" and confirming the end of the attorney-client relationship does not extend the accrual date of the statute of limitations with respect to completed matters. Bauer v. Ferriby & Houston, P.C., 235 Mich. App. 536, 539 (1999) (holding that unpaid follow-up activities to an already completed matter of representation do not extend the attorney-client relationship). In the case cited by plaintiff, Tupper v. LeBeuf, No. 229869, 2002 WL 1803920, *3 (Mich. App. Aug. 6, 2002), unlike in this case, the attorney-client relationship was extended because the attorney billed the plaintiff for the follow-up services.

Plaintiff also argues that the affidavit of use could have been filed as recently as February 2009, six months after the August 2, 2008 "cancellation date" on the USPTO website. However, under the plain language of 37 C.F.R. §2.160(a), the latest an affidavit of use could have been filed was April 30, 2008. It appears the date of cancellation referenced by plaintiff is merely the date on which the agency updated its records. Plaintiff also argues the attorney-client relationship was extended because defendant never terminated the power of attorney. However, as explained by defendant, the power of attorney expired by its own terms upon receipt of the certificate of registration in 2001. Count I is therefore barred by the applicable statute of limitations.

As to count III, there is no genuine dispute that the Kidsational infringement litigation was complete by April 2008. Plaintiff argues the six-month discovery rule protects him. The discovery rule provides that plaintiff must file suit "within 6 months after the plaintiff discovers or should have discovered the existence of the claim." MCL 600.5838(2). The

statute further provides that "[t]he burden of proving that the plaintiff neither discovered nor should have discovered the existence of the claim at least 6 months before the expiration of the period otherwise applicable to the claim shall be on the plaintiff." Id. In applying the discovery rule, courts evaluate when a plaintiff is aware of a possible cause of action. Solowy v. Oakwood Hosp. Corp., 454 Mich. 214, 221 (1997). "Once a plaintiff is aware of an injury and its possible cause, the plaintiff is equipped with the necessary knowledge to preserve and diligently pursue his claim." Id. at 223. Therefore, the six month period begins running at that time. Moreover, "[t]he discovery rule does not require the plaintiff to know with certainty that the defendant committed malpractice. It requires that the plaintiff know of the act or omission giving rise to the malpractice and that the plaintiff had reason to believe that it was improper." Rick v. Thumb Medical Imaging, P.C., No. 247526, 2004 WL 2390002, *1 (Mich. App. Oct. 26, 2004).

Plaintiff argues he did not discover that he had a potential malpractice suit until June of 2010 when he consulted his Florida-based attorney "about the potential malpractice in this case." Since this case was filed within six months following his meeting with his new attorney, plaintiff argues it is timely under the discovery rule.

However, it appears clear from the allegations in the complaint that plaintiff was aware of the potential malpractice claim relating to settlement of the shoe litigation much earlier, at least upon discovery of the Ethington letter. Count III asserts a claim based on defendant's failure to find the Ethington letter before "pushing" plaintiff to settle the shoe litigation. In paragraph 33 of the complaint, plaintiff alleges that he "refused this settlement [offer], remembering a letter from the original patent prosecuting attorney, and named partner of Defendant, Paul Ethington, that Plaintiffs' Patent gave Plaintiff patent protection

against infringement of any shoe that had a compartment in the 'region of the heel.'" He alleges defendant told him "that no such letter existed and that Mr. Ethington would not have made such a statement." He then claims that "[b]ased on this representation by Defendant," he "begrudgingly agreed to the settlement on April 2, 2008." He asserts he found the letter "from Paul Ethington explaining that 'Shoe' Patent gave Plaintiffs protection against infringement of any shoe that had a compartment in the 'region of the heel'" on or about March 3, 2010. He claims the letter gives a "clear indication" that the defendant in the patent litigation was "clearly infringing" on the shoe patent. It seems clear from these allegations that plaintiff was aware of the potential malpractice relating to the shoe litigation at the time he discovered the letter. Since more than six months passed after plaintiff discovered the letter and before he filed suit, count III is time-barred as well.[1]

Defendant's Motion for Sanctions

An attorney or party violates Federal Rule of Civil Procedure 11(b) by "presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it" – that the attorney knows is not well grounded in fact or warranted by "existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." "[T]he test for the imposition of Rule 11 sanctions is 'whether the individual's conduct was reasonable under the circumstances.'" Tropf v. Fid. Nat'l Title Ins. Co., 289 F.3d 929, 939 (6th Cir. 2002). Rule 11 imposes on litigants and their counsel a "continuing duty of candor," and a litigant may be sanctioned "for continuing to insist upon a position that is no longer tenable." Ridder v. City of

---

[1]Because the time-bar argument is dispositive, the court need not address the remainder of defendant's arguments.

Springfield, 109 F.3d 288, 293, 298 (6th Cir. 1997). The standard applies to *pro se* litigants:

> While, generally, a court holds *pro se* pleadings to "less stringent standards than formal pleadings drafted by lawyers," Haines v. Kerner, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), *pro se* litigants must still abide by Rule 11's certification requirements and are not exempt from Rule 11 sanctions "simply because they are not represented by counsel." King v. IB Prop. Holdings Acquisitions, 635 F.Supp.2d 651, 661 (E.D. Mich. 2009); see also Kaye v. Acme Invs., Inc., No. 08-12570, 2008 WL 4482304, *1 (E.D. Mich. Oct. 1, 2008) ("Pro se litigants must comply with Rule 11 no less than attorneys, and must make a reasonable inquiry as to whether the pleading in question is well-grounded in fact and warranted by existing law.").

Dye v. Washtenaw County Sheriff Dept., No. 11-13967, 2012 WL 32901, *2 (E.D. Mich. Jan. 6, 2012). Plaintiff's complaint in this case is borderline frivolous if not frivolous. However, plaintiff stipulated to the dismissal of Ruffactory, Inc., agreed to voluntarily dismiss three of his claims in response to defendant's motion for summary judgment, and is proceeding *pro se*. While the court empathizes with defendant's frustrations, the court exercises its discretion and denies defendant's request for sanctions.

CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is GRANTED and defendant's motion for sanctions is DENIED.

Dated: September 27, 2012

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record and on plaintiff Stephen Ruff, 874 Mills Estate Place, Chuluota, FL 32766, on September 27, 2012, by electronic and/or ordinary mail.

s/Barbara Radke
Deputy Clerk